# **Exhibit J**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2018

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 000-21392

# Amarin Corporation plc
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **England and Wales** | **Not applicable** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **2 Pembroke House, Upper Pembroke Street 28-32** | **Dublin 2, Ireland** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: +353 (0) 1 6699 020

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   YES ☒   NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   YES ☒   NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   YES ☐   NO ☒

307,461,189 common shares were outstanding as of October 30, 2018, including 303,882,906 shares held as American Depositary Shares (ADSs), each representing one Ordinary Share, 50 pence par value per share and 358,685 Ordinary Shares. In addition, 28,931,746 ordinary share equivalents were issuable in exchange for outstanding preferred shares as of October 30, 2018, for a total of 336,392,935 ordinary shares and ordinary share equivalents outstanding as of October 30, 2018.

*Commercialization – Outside the United States*

In February 2015, we announced an exclusive agreement with Eddingpharm to develop and commercialize Vascepa capsules in what we refer to as the China Territory, consisting of the territories of Mainland China, Hong Kong, Macau and Taiwan, for uses that are currently commercialized and under development by us in the United States based on the MARINE, ANCHOR and REDUCE-IT clinical trials of Vascepa. Under the agreement, Eddingpharm is responsible for development and commercialization activities in the China Territory and associated expenses. We will provide development assistance and be responsible for supplying the product. Terms of the agreement include up-front and milestone payments to us of up to $169.0 million, including a non-refundable $15.0 million up-front payment received at closing and a non-refundable milestone payment of $1.0 million received upon successful submission of a clinical trial application, or CTA, with respect to the MARINE indication for Vascepa to the Chinese regulatory authority in March 2016. In March 2017, the CTA was approved by the Chinese regulatory authority and, in December 2017, Eddingpharm commenced a pivotal clinical trial aimed to support the regulatory approval of the first indication of Vascepa in a patient population with severe hypertriglyceridemia in Mainland China. We are also entitled to receive future regulatory and sales-based milestone payments of up to an additional $153.0 million. The regulatory milestone events relate to the submission and approval of certain applications to the applicable regulatory authority, such as a clinical trial application, clinical trial exemption, or import drug license application. The amounts to be received upon achievement of the regulatory milestone events relate to the submission and approval for three indications, and range from $2.0 million to $15.0 million for a total of $33.0 million. The sales-based milestone events occur when annual aggregate net sales of Vascepa in the territory equals or exceeds certain specified thresholds, and range from $5.0 million to $50.0 million for a total of $120.0 million. Eddingpharm will also pay us tiered double-digit percentage royalties on net sales of Vascepa in the China Territory escalating to the high teens. We will supply finished product to Eddingpharm under negotiated terms.

In March 2016, we entered into an agreement with Biologix FZCo, or Biologix, to register and commercialize Vascepa in several Middle Eastern and North African countries. Under the terms of the distribution agreement, we granted to Biologix a non-exclusive license to use our trademarks in connection with the importation, distribution, promotion, marketing and sale of Vascepa in the Middle East and North Africa territory. Upon closing of the agreement, we received a non-refundable up-front payment, which will be recognized as revenue over 10 years commencing upon first marketing approval of Vascepa in the territory. We receive all payments based on total product sales and pay Biologix a service fee in exchange for its services, whereby the service fee represents a percentage of gross selling price which is subject to a minimum floor price. In March 2018 and July 2018, we received approval for Vascepa as a prescription medication for use in Lebanon and United Arab Emirates, respectively, as an adjunct to diet to reduce triglyceride levels in adult patients with severe hypertriglyceridemia.

In September 2017, we entered into an agreement with HLS to register, commercialize and distribute Vascepa in Canada. Under the agreement, HLS will be responsible for regulatory and commercialization activities and associated costs. We will be responsible for providing assistance towards local filings, supplying finished product under negotiated supply terms, maintaining intellectual property, and continuing the development and funding of REDUCE-IT-related activities. Terms of the agreement include up-front and milestone payments to us of up to $65.0 million. These payments include a non-refundable $5.0 million up-front payment received in two equal installments, the first of which was received at closing with the second received upon the six-month anniversary of the closing, as well as a non-refundable milestone payment of $2.5 million received upon achievement of the REDUCE-IT trial primary endpoint. In addition to the non-refundable, up-front payment, we are entitled to receive certain regulatory and sales-based milestone payments of up to an additional $57.5 million, the timing and achievability of which cannot be determined at least until discussions with Canadian regulatory authorities have commenced, as well as tiered double-digit royalties on net sales of Vascepa in Canada.

We continue to assess other partnership opportunities for licensing Vascepa to partners outside of the United States.

*Research and Development*

REDUCE-IT is the first prospective cardiovascular outcomes study of any drug in a population of patients who, despite stable statin therapy, have elevated triglyceride levels. REDUCE-IT is a multinational, prospective, randomized, double-blind, placebo-controlled study designed to assess the cumulative effect on the rate of cardiovascular events for patients treated with Vascepa as an add-on to statin therapy compared to the corresponding rate of cardiovascular events for patients treated with placebo on top of statin therapy. REDUCE-IT was not designed to demonstrate that lowering triglycerides alone in the study population is sufficient to lower the rate of major adverse cardiovascular events compared to placebo. Rather, it was designed to test the hypothesis that the clinical effects of Vascepa, including, but not limited to, its impact on triglyceride lowering, are effective in lowering the rate of major adverse cardiovascular events compared to placebo in patients who despite statin therapy have risk factors for cardiovascular disease, including elevated triglyceride levels. Based on the final positive results of REDUCE-IT, we plan to seek additional indications for Vascepa beyond the indications studied in the ANCHOR or MARINE trials.

In 2016, we completed patient enrollment and randomization of 8,175 individual patients into the REDUCE-IT study, exceeding the 8,000 patients targeted for the trial.

The REDUCE-IT study topline study results were made public in September 2018, and broader reporting of results is planned at the 2018 Scientific Sessions of the American Heart Association (AHA) on November 10, 2018 in Chicago, Illinois.

The REDUCE-IT study, since its inception in 2011, was conducted based on a SPA agreement with the FDA. Since patient enrollment commenced in 2011, over 35,000 patient years of study experience were accumulated in the REDUCE-IT study. Our scientific rationale for the REDUCE-IT study was supported by (i) epidemiological data that suggests elevated triglyceride levels correlate with increased cardiovascular disease risk, (ii) genetic data that suggests triglyceride and/or triglyceride-rich lipoproteins (as well as low-density lipoprotein cholesterol (LDL cholesterol), known as bad cholesterol) are independently in the causal pathway for cardiovascular disease and (iii) clinical data that suggest substantial triglyceride reduction in patients with elevated baseline triglyceride levels correlates with reduced cardiovascular risk. Our scientific rationale for the REDUCE-IT study was also supported by research on the putative cardioprotective effects of EPA as presented in scientific literature. It is possible that the effects of EPA may be due not to a single mode of action, such as triglyceride lowering, but rather to multiple mechanisms working together. Studies in the scientific literature explore potentially beneficial effects of EPA on multiple atherosclerosis processes, including endothelial function, oxidative stress, foam cell formation, inflammation/cytokines, plaque formation/progression, platelet aggregation, thrombus formation, and plaque rupture. The REDUCE-IT study was needed to determine the clinical benefit of Vascepa therapy in statin-treated patients with controlled levels of LDL cholesterol, elevated triglyceride levels and other cardiovascular risk factors.

In June 2018, we entered into a multi-faceted collaboration with Mochida related to the development and commercialization of drug products and indications based on the active pharmaceutical ingredient in Vascepa, the omega-3 acid, EPA. Among other terms in the agreement, we obtained an exclusive license to certain Mochida intellectual property to advance our interests in the United States and certain other territories and the parties will collaborate to research and develop new products and indications based on EPA for our commercialization in the United States and certain other territories. The potential new product and indication opportunities contemplated under this agreement are currently in early stages of development. Upon closing of the collaboration agreement, we are required to make a non-refundable, non-creditable upfront payment of approximately $2.7 million. In addition, the agreement provides for milestone payments from us upon the achievement of certain product development milestones and royalties on net sales of future products arising from the collaboration, if any. We expect that expenditures related to research and development activities for product candidates under the collaboration agreement will be immaterial in 2018 and less than $5.0 million in 2019.

*Commercial and Clinical Supply*

We manage our supply chain internally but rely on contract manufacturers in each step of our commercial and clinical product supply, namely, active pharmaceutical ingredient, or API, manufacturing, encapsulation, packaging and supply-related logistics. Our approach to product supply seeks to mitigate risk of supply interruption and maintain an environment of cost competition and supply chain diversification. API for Vascepa is manufactured by three independent FDA-approved suppliers: Nisshin Pharma, Inc., or Nisshin, Finorga SAS, or Novasep, and Chemport, Inc., or Chemport. We encapsulate Vascepa through three independent FDA-approved commercial API encapsulators: Patheon, Inc. (formerly Banner Pharmacaps, now part of Thermo Fisher Scientific), Catalent Pharma Solutions, and Capsugel Plöermel SAS, (now a Lonza company), or Capsugel. The amount of supply we seek to purchase in future periods will depend on the level of growth of Vascepa revenues and minimum purchase commitments with certain suppliers. While our current supply chain is scalable, we continue efforts to expand, diversify and further enhance it.

*Financial Position*

We believe that our cash and cash equivalents of $81.9 million as of September 30, 2018 will be sufficient to fund our projected operations through planned expansion of our sales force and the anticipated submission in early 2019 of a supplemental new drug application (sNDA) with the FDA based on REDUCE-IT study results. Depending on the level of cash generated from operations, and in light of the recently announced successful results of the REDUCE-IT study, additional capital may be required to support planned expansion of Vascepa promotion and potential Vascepa promotion beyond which we are currently executing. If additional capital is required and we are unable to obtain additional capital, we may be forced to delay, limit or eliminate certain promotional activities. We anticipate that quarterly net cash outflows in future periods will be variable.

**Financial Operations Overview**

*Product Revenue, net*. All of our product revenue is derived from product sales of 1-gram and 0.5-gram size capsules of Vascepa, net of allowances, discounts, incentives, rebates, chargebacks and returns. We sell product to a limited number of major wholesalers, as well as selected regional wholesalers and specialty pharmacy providers, or collectively, our Distributors or our customers, who resell the product to retail pharmacies for purposes of their reselling the product to fill patient prescriptions. We commenced our commercial launch of 1-gram size Vascepa capsules in the United States in January 2013, and introduced a smaller 0.5-gram capsule size in October 2016. Revenues from product sales are recognized when the Distributor obtains control of our product, which occurs at a point in time, typically upon delivery to the Distributor.

*Licensing revenue*. Licensing revenue currently consists of revenue attributable to receipt of up-front, non-refundable payments and milestone payments related to license and distribution agreements for Vascepa outside the United States. We recognize revenue from licensing arrangements as we fulfill the performance obligations under each of the agreements.

*Cost of Goods Sold*. Cost of goods sold includes the cost of API for Vascepa on which revenue was recognized during the period, as well as the associated costs for encapsulation, packaging, shipment, supply management, quality assurance, insurance, and other indirect manufacturing, logistics and product support costs. The cost of the API included in cost of goods sold reflects the average cost method of inventory valuation and relief. This average cost reflects the actual purchase price of Vascepa API.

*Selling, General and Administrative Expense*. Selling, general and administrative expense consists primarily of salaries and other related costs, including stock-based compensation expense, for personnel in our sales, marketing, executive, business development, finance and information technology functions, as well as co-promotion fees payable to Kowa Pharmaceuticals America, Inc. Other costs primarily include facility costs and professional fees for accounting, consulting and legal services.

*Research and Development Expense*. Research and development expense consists primarily of fees paid to professional service providers in conjunction with independent monitoring of our clinical trials and acquiring and evaluating data in conjunction with our clinical trials, fees paid to independent researchers, costs of qualifying contract manufacturers, services expenses incurred in developing and testing products and product candidates, salaries and related expenses for personnel, including stock-based compensation expense, costs of materials, depreciation, rent, utilities and other facilities costs. In addition, research and development expenses include the cost to support current development efforts, costs of product supply received from suppliers when such receipt by us is prior to regulatory approval of the supplier, as well as license fees related to our strategic collaboration with Mochida Pharmaceutical Co., Ltd. We expense research and development costs as incurred.

*Interest and Other (Expense) Income, Net*. Interest expense consists of interest incurred under lease obligations, interest incurred under our December 2012 royalty-bearing instrument financing arrangement, and interest incurred under our 3.5% exchangeable notes. Interest expense under our royalty-bearing instrument financing arrangement is calculated based on an estimated repayment schedule. Interest expense under our exchangeable notes includes the amortization of the conversion option related to our exchangeable debt, the amortization of the related debt discounts and debt obligation coupon interest. Interest income consists of interest earned on our cash and cash equivalents. Other (expense) income, net, consists primarily of foreign exchange losses and gains.

*(Provision for) Benefit from Income Taxes*. (Provision for) benefit from income taxes, deferred tax assets and liabilities, and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in both the United States and foreign jurisdictions. In applying the estimated annual effective tax rate approach prescribed under ASC 740-270 and based on present evidence and conclusions around the realizability of deferred tax assets, we determined that any tax benefit related to the pretax losses generated during the three and nine months ended September 30, 2018 and 2017 is neither more likely than not to be realized in the current year nor realizable as a deferred tax asset at the end of the year. Therefore, the appropriate amount of income tax benefit to recognize during the three and nine months ended September 30, 2018 and 2017 is zero.

**Critical Accounting Policies and Significant Judgments and Estimates**

Our discussion and analysis of our financial condition and results of operations is based on our condensed consolidated financial statements and notes, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenue and expenses. On an ongoing basis, we evaluate our estimates and judgments, including those related to derivative financial liabilities. We base our estimates on historical experience and on various market-specific and other relevant assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. Estimates are assessed each period and updated to reflect current information. A summary of our significant accounting policies is contained in Note 2 to our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. A summary of our critical accounting policies, significant judgments and estimates is presented in Part II, Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2017. There were no material changes to our critical accounting policies, significant judgments and estimates during the nine months ended September 30, 2018, other than as set forth below.

*Revenue Recognition*—In accordance with GAAP, under Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers*, which we adopted on a modified retrospective basis effective January 1, 2018, we recognize revenue when our Distributors obtain control of promised goods or services, in an amount that reflects the consideration which we expect to receive in exchange for those goods or services. To determine revenue recognition for arrangements that we determine are within the scope of Topic 606, we perform the following five steps: (i) identify the contract(s) with a Distributor; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) we satisfy a performance obligation. We apply the five-step model to contracts only when it is probable that we will collect the consideration we are entitled to in exchange for the goods or services we transfer to the Distributor. At contract inception, once the contract is determined to be within the scope of Topic 606, we assess the goods or services promised within each contract, determine those that are performance obligations and assess whether each promised good or service is distinct. We then recognize as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. For a complete discussion of our accounting for net product revenue and licensing revenues, see Note 2—Significant Accounting Policies.

We sell Vascepa principally to a limited number of Distributors that in turn resell Vascepa to retail pharmacies that subsequently resell it to patients and healthcare providers. We began recognizing revenue from the sale of Vascepa following our commercial launch in the United States in January 2013. Prior to 2013, we recognized no revenue from Vascepa sales. In accordance with GAAP, we recognize revenue when the Distributor obtains control of our product, which occurs at a point in time, typically upon delivery to the Distributor. We recognized net product revenues of $151.3 million and $126.3 million based on sales to Distributors during the nine months ended September 30, 2018 and 2017, respectively.

We have written contracts with our Distributors, and transfer of control typically occurs upon delivery of our product to the Distributor. We evaluate the creditworthiness of each of our Distributors to determine whether revenues can be recognized upon delivery, subject to satisfaction of the other requirements, or whether recognition is required to be delayed until receipt of payment. We calculate gross product revenues based on the wholesale acquisition cost that we charge our Distributors for Vascepa. We estimate our net product revenues by deducting from our gross product revenues (a) trade allowances, such as invoice discounts for prompt payment and distributor fees, (b) estimated government and private payor rebates, chargebacks and discounts, such as Medicaid reimbursements, (c) reserves for expected product returns and (d) estimated costs of incentives offered to certain indirect customers, including patients. The gross to net deductions are estimated based on available actual information, historical data, known trends, and levels of inventory in the distribution channel. We rely on resale data provided by our Distributors as well as prescription data provided by Symphony Health and IQVIA in estimating the level of inventory held in the distribution channel. A hypothetical 5% change in estimated aggregate bottles of channel inventory would result in a change of less than 1% in net product revenues reported during each of the nine months ended September 30, 2018 and 2017.

When evaluating licensing arrangements, we perform the following steps: (i) identification of the promised goods or services in the contract; (ii) determination of whether the promised goods or services are performance obligations including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) we satisfy each performance obligation. In determining performance obligations, we evaluate whether the license is distinct from the other performance obligations with the collaborative partner based on the consideration of the relevant facts and circumstances for each arrangement. Factors considered in the determination of include the stage of development of the license delivered, research and development capabilities of the partner and the ability of partners to develop and commercialize Vascepa independent of us.

If the license to our intellectual property is determined to be distinct from the other performance obligations identified in the arrangement, we recognize revenues from non-refundable, up-front fees allocated to the license when the license is transferred to the

In some foreign countries, including major markets in the European Union and Japan, the pricing of prescription pharmaceuticals is subject to governmental control. In these countries, pricing negotiations with governmental authorities can take 6 to 12 months or longer after the receipt of regulatory marketing approval for a product. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a pharmacoeconomic study that compares the cost-effectiveness of Vascepa to other available therapies. Such pharmacoeconomic studies can be costly and the results uncertain. Our business could be harmed if reimbursement of our products is unavailable or limited in scope or amount or if pricing is set at unsatisfactory levels.

***The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products. If we or our partners are found to have improperly promoted uses, efficacy or safety of Vascepa, we may become subject to significant fines and other liability. The government may seek to find means to prevent our promotion of truthful and non-misleading information beyond the current court ruling and litigation settlement.***

The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products. In particular, in general, the U.S. government's position has been that a product may not be promoted for uses that are not approved by the FDA as reflected in the product's approved labeling. Even though we received FDA marketing approval for Vascepa for the MARINE indication and we believe the First Amendment court ruling and litigation settlement affords us a degree of protection for other promotional efforts, physicians may still prescribe Vascepa to their patients for use in the treatment of conditions that are not included as part of the indication statement in our FDA-approved Vascepa label or our settlement. If we are found to have promoted Vascepa outside the terms of the litigation settlement or in violation of what federal or state government may determine to be acceptable, we may become subject to significant government fines and other related liability, such as under the FDCA, the False Claims Act, or other theories of liability. Government may also seek to hold us responsible for the non-compliance of our co-promotion partner, Kowa Pharmaceuticals America, Inc., or our commercialization partners outside the United States. For example, the Federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed.

In addition, incentives exist under applicable laws that encourage competitors, employees and physicians to report violations of rules governing promotional activities for pharmaceutical products. These incentives could lead to so-called "whistleblower lawsuits" as part of which such persons seek to collect a portion of moneys allegedly overbilled to government agencies due to, for example, promotion of pharmaceutical products beyond labeled claims. These incentives could also lead to suits that we have mischaracterized a competitor's product in the marketplace and we may, as a result, be sued for alleged damages to our competitors. Such lawsuits, whether with or without merit, are typically time-consuming and costly to defend. Such suits may also result in related shareholder lawsuits, which are also costly to defend.

Even though we have a final settlement in our litigation related to promotion beyond FDA-approved labeling, our promotion would still be subject to a high, perhaps abnormally high, degree of scrutiny to ensure that our promotion remains within the permitted scope. Likewise, federal or state government may seek to find other means to prevent our promotion of truthful and non-misleading information.

***We may not be successful in developing or marketing future products if we cannot meet the extensive regulatory requirements of the FDA and other regulatory agencies for quality, safety and efficacy.***

The success of our research and development efforts is dependent in part upon our ability, and the ability of our partners or potential partners, to meet regulatory requirements in the jurisdictions where we or our partners or potential partners ultimately intend to sell such products once approved. The development, manufacture and marketing of pharmaceutical products are subject to extensive regulation by governmental authorities in the United States and elsewhere. In the United States, the FDA generally requires preclinical testing and clinical trials of each drug to establish its safety and efficacy and extensive pharmaceutical development to ensure its quality before its introduction into the market. Regulatory authorities in other jurisdictions impose similar requirements. The process of obtaining regulatory approvals is lengthy and expensive and the issuance of such approvals is uncertain. The commencement and rate of completion of clinical trials and the timing of obtaining marketing approval from regulatory authorities may be delayed by many factors, including but not limited to:

- the lack of efficacy during clinical trials;
- the inability to manufacture sufficient quantities of qualified materials under cGMPs for use in clinical trials;
- slower than expected rates of patient recruitment;
- the inability to observe patients adequately after treatment;
- changes in regulatory requirements for clinical trials or preclinical studies;
- the emergence of unforeseen safety issues in clinical trials or preclinical studies;

- delay, suspension, or termination of a trial by the institutional review board responsible for overseeing the study at a particular study site;

- unanticipated changes to the requirements imposed by regulatory authorities on the extent, nature or timing of studies to be conducted on quality, safety and efficacy;

- government or regulatory delays or "clinical holds" requiring suspension or termination of a trial; and

- political instability affecting our clinical trial sites.

Even if we obtain positive results from early stage preclinical studies or clinical trials, we may not achieve the same success in future trials. Clinical trials that we or potential partners conduct may not provide sufficient safety and efficacy data to obtain the requisite regulatory approvals for product candidates. The failure of clinical trials to demonstrate safety and efficacy for our desired indications could harm the development of that product candidate as well as other product candidates, and our business and results of operations would suffer. For example, the efficacy results of our Vascepa Phase 3 clinical trials for the treatment of Huntington's disease were negative. As a result, we stopped development of that product candidate, revised our clinical strategy and shifted our focus to develop Vascepa for use in the treatment of cardiovascular disease. Questions can also arise on the quality of study data or its reliability. For example, during the public advisory committee meeting held by FDA as part of its review of our ANCHOR sNDA, a discussion regarding observed, nominally statistically significant changes from baseline in an adverse direction, while on background statin therapy, in certain lipid parameters, including triglycerides, in the placebo group, raised questions about the possibility that the mineral oil placebo used in the ANCHOR trial (and in the REDUCE-IT trial) might not be biologically inert and might be viewed as artificially exaggerating the clinical effect of Vascepa when measured against placebo in the ANCHOR trial. Ultimately, no strong evidence for biological activity of mineral oil was identified by the FDA before its approval of Vascepa after review of the MARINE and ANCHOR trials and consideration of other data regarding mineral oil. It was ultimately concluded that the between-group differences likely provided the most appropriate descriptions of the treatment effect of Vascepa and that whatever factor(s) led to the within-group changes over time in the placebo group were likely randomly distributed to all treatment groups. Thus, the FDA approved Vascepa for use in the MARINE indication in July 2012, FDA did not dispute the veracity of the ANCHOR trial data and, in connection with the March 2016 agreement we reached with the FDA allowing us to promote the results of the ANCHOR study, the FDA did not seek to require that we include any qualification related to this earlier question regarding the mineral oil placebo. The FDA, early on in the course of the REDUCE-IT trial, directed the DMC for REDUCE-IT to periodically review unblinded lipid data to monitor for signals that the placebo might not be inert. After each such quarterly unblinded safety analysis and review meeting to date, the DMC recommended to continue the REDUCE-IT study as planned. Each of these DMC recommendations has been shared with FDA. This matter illustrates that concerns such as this may arise in the future that could affect our product development, regulatory review or the public perception of our products and our future prospects, including REDUCE-IT results.

Any approvals that are obtained may be limited in scope, may require additional post-approval studies or may require the addition of labeling statements focusing on product safety that could affect the commercial potential for our product candidates. Any of these or similar circumstances could adversely affect our ability to gain approval for new indications and affect revenues from the sale of our products. Even in circumstances where products are approved by a regulatory body for sale, the regulatory or legal requirements may change over time, or new safety or efficacy information may be identified concerning a product, which may lead to the withdrawal of a product from the market or similar use restrictions. The discovery of previously unknown problems with a clinical trial or product, or in connection with the manufacturer of products, may result in regulatory issues that prevent past or proposed future approvals of a product and/or restrictions on that product or manufacturer, including withdrawal of an indication or the product from the market, which would have a negative impact on our potential revenue stream.

***As we continue to evolve from a company primarily involved in research and development to a company also focused on establishing an infrastructure for commercializing Vascepa, we may encounter difficulties in managing our growth and expanding our operations successfully.***

The process of establishing a commercial infrastructure is difficult, expensive and time-consuming. Prior to REDUCE-IT results topline announcement in September 2018, our sales team consisted of approximately 170 sales professionals, including sales representatives and their managers. We are currently increasing the size of our sales force to a planned total of over 400 sales professionals in the United States and expanding our promotion of Vascepa. This sales team promotes Vascepa to a limited group of physicians and other healthcare professionals in select geographies in the United States. Even after planned expansion, this sales team is not large enough to call upon all physicians.

In addition to sales force expansion in the United States, Amarin plans to work with its international partners to support regulatory efforts outside the United States based on REDUCE-IT results. As our operations expand with the anticipated growth of our product sales, we expect that we will need to manage additional relationships with various collaborative partners, suppliers and other third parties. Future growth will impose significant added responsibilities on members of management, including the need to identify, recruit, maintain and integrate additional employees. Our future financial performance and our ability to commercialize Vascepa and to compete effectively will depend, in part, on our ability to manage our future growth effectively. To that end, we must be able to

manage our development efforts effectively, and hire, train, integrate and retain additional management, administrative and sales and marketing personnel. We may not be able to accomplish these tasks, and our failure to accomplish any of them could prevent us from successfully growing our company.

**Risks Related to Our Reliance on Third Parties**

*Our supply of product for the commercial market and clinical trials is dependent upon relationships with third-party manufacturers and key suppliers.*

We have no in-house manufacturing capacity and rely on contract manufacturers for our clinical and commercial product supply. We cannot ensure that we will successfully manufacture any product we may develop, either independently or under manufacturing arrangements, if any, with our third-party manufacturers. Moreover, if any manufacturer should cease doing business with us or experience delays, shortages of supply or excessive demands on their capacity, we may not be able to obtain adequate quantities of product in a timely manner, or at all.

Any manufacturing problem, natural disaster affecting manufacturing facilities, or the loss of a contract manufacturer could be disruptive to our operations and result in lost sales. Any reliance on suppliers may involve several risks, including a potential inability to obtain critical materials and reduced control over production costs, delivery schedules, reliability and quality. Any unanticipated disruption to future contract manufacture caused by problems at suppliers could delay shipment of products, increase our cost of goods sold and/or result in lost sales. If our suppliers were unable to supply us with adequate volumes of active pharmaceutical ingredient (drug substance) or encapsulated bulk product (drug product), it would have a material adverse effect on our ability to continue to commercialize Vascepa.

We initially purchased all of our supply of the bulk compound (ethyl-EPA), or Vascepa API, from a single supplier, Nisshin Pharma, Inc., or Nisshin, located in Japan. Nisshin was approved by the FDA as a Vascepa API supplier as part of our FDA NDA for the MARINE indication in July 2012. In April 2013, we announced the approval by the FDA of an NDA supplement for Chemport, Inc. and BASF (formerly Equateq Limited) as additional Vascepa API suppliers. We terminated our agreement with BASF due to its inability to meet the agreement requirements, may enter into a new development and supply agreement with BASF, and may purchase API from BASF as it remains an NDA-approved supplier. In 2014, we obtained sNDA approval for a fourth supplier of API, which includes the manufacturing facility of Finorga SAS (Novasep). We currently purchase and use commercial supply from Novasep, Chemport, and Nisshin. Each of the API manufacturers obtains supply of the key raw material to manufacture API from other qualified third-parties.

While we have contractual freedom to source the API for Vascepa and have entered into supply agreements with multiple suppliers who also rely on other third-party suppliers to manufacture the API for Vascepa, Novasep, Nisshin and Chemport currently supply all of our API for Vascepa. Our strategy in adding API suppliers has been to expand manufacturing capacity, maintain competitive advantages, and mitigate the risk of reliance on any single supplier.

Expanding manufacturing capacity and qualifying such capacity is complex and subject to numerous regulations and other operational challenges. The resources of our suppliers vary and are limited; costs associated with projected expansion and qualification can be significant. For example, Chemport, which was approved as one of our API suppliers in April 2013, is a privately-held company and their commitment to Vascepa supply has required them to seek additional resources. There can be no assurance that the expansion plans of any of our suppliers will be successful. Our aggregate capacity to produce API is dependent upon the qualification of our API suppliers. Each of our API suppliers has outlined plans for potential further capacity expansion. If no additional API supplier is approved by the FDA as part of an sNDA, our API supply will be limited to the API we purchase from previously approved suppliers. If our third-party manufacturing capacity is not expanded and/or compliant with applicable regulatory requirements, we may not be able to supply sufficient quantities of Vascepa to meet anticipated demand. We cannot guarantee that we can contract with any future manufacturer on acceptable terms or that any such alternative supplier will not require capital investment from us in order for them to meet our requirements. Alternatively, our purchase of supply may exceed actual demand for Vascepa.

We currently have encapsulation agreements with three commercial API encapsulators for the encapsulation of Vascepa: Patheon, Inc. (formerly Banner Pharmacaps, now part of Thermo Fisher Scientific), Catalent Pharma Solutions, and Capsugel Plöermel SAS (now a Lonza company). These companies have qualified and validated their manufacturing processes and are capable of manufacturing Vascepa. There can be no guarantee that additional other suppliers with which we have contracted to encapsulate API will be qualified to manufacture the product to our specifications or that these and any future suppliers will have the manufacturing capacity to meeting anticipated demand for Vascepa.

*We may purchase too much or not enough supply to satisfy actual demand, which could have a material adverse effect on our financial results and financial condition.*

Certain of our agreements with our suppliers include minimum purchase obligations and limited exclusivity provisions. These purchases are generally made on the basis of rolling twelve-month forecasts which in part are binding on us and the balance of which are subject to adjustment by us subject to certain limitations. Certain of our agreements also include contractual minimum purchase commitments regardless of the rolling twelve-month forecasts. We may not purchase sufficient quantities of Vascepa to meet actual demand or our purchase of supply may exceed actual demand. In either case, such event could have a material adverse effect on our financial results and financial condition.

*The manufacture, packaging and distribution of pharmaceutical products such as Vascepa are subject to FDA regulations and those of similar foreign regulatory bodies. If we or our third-party manufacturers fail to satisfy these requirements, our product development and commercialization efforts may be materially harmed.*

The manufacture, packaging and distribution of pharmaceutical products, such as Vascepa, are regulated by the FDA and similar foreign regulatory bodies and must be conducted in accordance with the FDA's pharmaceutical current good manufacturing practices, or cGMPs, and comparable requirements of foreign regulatory bodies. There are a limited number of manufacturers that operate under these cGMPs and International Council for Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, or ICH, regulations who are both capable of manufacturing Vascepa and willing to do so. Failure by us or our third-party manufacturers to comply with applicable regulations, requirements, or guidelines could result in sanctions being imposed on us, including fines, injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our products, delays, suspension or withdrawal of approvals, license revocation, seizures or voluntary recalls of product, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect our business. If we are not able to manufacture Vascepa to required specifications through our current and potential API suppliers, we may be delayed in successfully supplying the product to meet anticipated demand and our anticipated future revenues and financial results may be materially adversely affected.

Changes in the manufacturing process or procedure, including a change in the location where the product is manufactured or a change of a third-party manufacturer, may require prior FDA review and pre-approval of the manufacturing process and procedures in accordance with the FDA's cGMPs. Any new facility may be subject to a pre-approval inspection by the FDA and would again require us to demonstrate product comparability to the FDA. There are comparable foreign requirements under ICH guidelines. This review may be costly and time consuming and could delay or prevent the launch of a product.

Furthermore, the FDA and foreign regulatory agencies require that we be able to consistently produce the API and the finished product in commercial quantities and of specified quality on a repeated basis, including demonstrated product stability, and document our ability to do so. This requirement is referred to as process validation. This includes stability testing, measurement of impurities and testing of other product specifications by validated test methods. If the FDA does not consider the result of the process validation or required testing to be satisfactory, the commercial supply of Vascepa may be delayed, or we may not be able to supply sufficient quantities of Vascepa to meet anticipated demand.

The FDA and similar foreign regulatory bodies may also implement new requirements, or change their interpretation and enforcement of existing requirements, for manufacture, packaging or testing of products at any time. If we or our approved suppliers are unable to comply, we may be subject to regulatory, civil actions or penalties which could significantly and adversely affect our business.

*Our commercialization of Vascepa outside the United States is substantially dependent on third parties.*

We have expanded our Vascepa commercialization activities outside of the United States through several contractual arrangements in territories including China, the Middle East, North Africa and Canada. We continue to assess other opportunities to develop Vascepa commercialization outside of the United States through similar arrangements.

In February 2015, we entered into a Development, Commercialization and Supply Agreement, or the DCS Agreement, with Eddingpharm related to the development and commercialization of Vascepa in the China Territory. Under the DCS Agreement, Eddingpharm is responsible for development and commercialization activities in the China Territory and associated expenses. Additionally, Eddingpharm is required to conduct clinical trials in the China Territory to secure regulatory approval in certain territories. For example, in December 2017, Eddingpharm commenced a pivotal clinical trial aimed to support the regulatory approval of the first indication of Vascepa in a patient population with severe hypertriglyceridemia in Mainland China. Additional clinical development efforts may be necessary in this market. Significant commercialization of Vascepa in the China Territory is several years away, if at all. If Eddingpharm is not able to effectively develop and commercialize Vascepa in the China Territory, we may not be able to generate revenue from the DCS Agreement resulting from the sale of Vascepa in the China Territory.